Steven DAVIS, Appellant,

v.

The STATE of Texas, Appellee.

NUMBERS 13-15-00355-CR
& 13-15-00356-CR

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed June 1, 2017

Discretionary Review Refused
November 15, 2017

502

Hon. Amanda Erwin, The Erwin Law Firm, L.L.P., San Marcos, for Appellant.

Hon. Paul Watkins, County Attorney, Hon. Keri L. Miller, Asst. County Attorney, Gonzales, for Appellee.

Before Chief Justice Valdez and Justices Rodriguez and Hinojosa

**OPINION**

Opinion by Justice Hinojosa

Appellant Steven Davis appeals his convictions for aggravated assault with a deadly weapon, a second-degree felony, and assault family violence, a third-degree felony.[1] *See* Tex. Penal Code Ann. §§ 22.01, .02 (West, Westlaw through 2015 R.S.). Both convictions were enhanced by appellant's status as a habitual felony offender. *See id.* § 12.42(d) (West, Westlaw through 2015 R.S.). A jury returned a guilty verdict on both counts and assessed punishment of concurrent terms of sixty years' imprisonment in the Texas Department of Criminal Justice-Institutional Division. By three issues, appellant argues: (1) there is insufficient evidence that the appellant and the complainant were members of the same household; (2) there is insufficient evidence that appellant used or exhibited a deadly weapon; and (3) appellant's trial counsel was ineffective. We conclude that cellmates in a jail are not members of the same household under the assault family violence statute and that there is legally insufficient evidence that appellant's hands were used as a deadly weapon. Therefore, we reverse and remand to the trial court to reform the judgment to reflect a single conviction for assault causing bodily injury and to conduct a new punishment hearing.

## I. Background

This case arises out of a physical altercation between appellant and Vernon Pullin, appellant's cellmate. A grand jury returned an indictment alleging that appellant had committed aggravated assault by causing bodily injury to Pullin, while exhibiting or using a deadly weapon; "to-wit, hand(s)."[2] Under a second count, the indictment alleged appellant committed assault family violence against Pullin, "a member of [appellant's] household," and appellant was previously convicted of an assault involving family violence.

The following evidence was adduced at trial. Appellant and Pullin shared a Gonzalez County jail cell. Jailers removed the television from their cell due to Pullin's verbal abuse of jail staff. Appellant complained to the staff that it was unfair for him to be punished for Pullin's actions. Appellant asked Officer Corey Fonseca to remove him from the cell or "problems . . . would occur." He also informed Corporal Gracie Rodella that if the staff did not remove Pullin, appellant would "handle it himself." Neither Pullin nor appellant was removed, but Corporal Rodella instructed Officer Fonseca to monitor the cell. Sometime later, Pullin knocked on the window of the cell and asked to be removed, but his request was again denied. After Pullin attempted to alert jail staff a second time, Officer Fonseca opened the curtain to the cell and observed appellant strike Pullin in the back of the head with his fist causing Pullin's head to hit the ledge of the window. Officer Fonseca observed appellant "throw[ ] a few punches" to Pullin's face and chest area while Pullin "cover[ed] up" in a defensive position. Officer Fonseca called for backup and then entered the cell with Corporal Rodella and Officer Devon

---

1. Appellate cause no. 13-15-00355-CR pertains to appellant's conviction for aggravated assault with a deadly weapon. Appellate cause no. 13-15-00356-CR pertains to appellant's conviction for assault family violence. The charges were tried together, allowing us to consider both convictions in a consolidated opinion.

2. Before trial, the State abandoned a paragraph in the indictment which alleged that appellant had committed aggravated assault by causing serious bodily injury. *See* Tex. Penal Code Ann. § 22.02(a)(1) (West, Westlaw through 2015 R.S.).

Taylor. The officers observed appellant hitting Pullin, whose hands were in front of his face in a defensive position.

Appellant backed away when the officers entered, and they were able to remove Pullin from the cell. A jailer later transported Pullin to the hospital where he received stitches to treat a laceration to his nose. Pullin also suffered bruising to his left temple and a black eye.

Pullin testified that, prior to the altercation, appellant stated he "wasn't going to pay for someone else's problems" and he was going to "whoop [Pullin's] ass." On the morning of the assault, appellant told Pullin "you better get up, fat boy, it's time to fight[.]" Pullin explained that he was trying to get Officer Fonseca's attention when he "felt [appellant] rush up behind [him], and . . . hit [him] in the back of the head[.]" Pullin explained, "I turned around and started to defend myself. . . . I kicked him off of me a couple times and just kept on . . . pushing him away from me as he kept on continuing to hit me." Pullin recalled that appellant hit him "a couple more times" on the head. Pullin stated he suffered bruises on his face and a laceration to his nose when it struck the ledge of the cell window. Pullin said he still has a scar on his nose and experiences numbness on parts of his head. The trial court admitted photographs depicting the injuries to Pullin's face and head. A hospital nurse testified that Pullin received stitches to treat the laceration on his nose and that Pullin also suffered a contusion to his temple.

According to medical records, Pullin was discharged less than an hour after arriving at the emergency room. When examined, Pullin was alert, oriented to person, place, and time, and cooperative. Pullin received stitches for a two-and-one-half centimeter laceration to his nose. The injury was further treated with Neosporin and an adhesive bandage. Upon discharge, Pullin received instructions to take Tylenol every four hours as needed for pain, apply a topical antibiotic, and follow up with a physician in one week to have the stitches removed.

Appellant testified that the physical confrontation began before Pullin approached the cell window. Appellant stated Pullin aggravated him, and he asked Pullin "how are we going to take care of the matter?" According to appellant, the two then "engaged in a one-on-one battle." Appellant claimed Pullin tried to kick him and "rastled [him] down." Appellant further claimed that he fell to the ground, and that Pullin stomped on his hand. Appellant maintained that Pullin attempted to get the attention of a corrections officer only after Pullin "started to lose the battle."

Appellant provided a written statement to a Gonzalez County Sheriff's deputy. In his statement, appellant stated that he told a jailer "she was leaving [Pullin] in to be punished by me if she refused to punish him for his actions." Appellant explained that "she left an inmate in the faith [sic] of other inmates, which could have turned tragic all because of her poor judgment and the choice she made . . . caused [Pullin] to be assaulted."

Gonzalez County Sheriff's deputy Travis Vega testified that "a fist or a hand . . . could cause serious bodily injury, could leave somebody dysfunctional or . . . have bad injuries." Chief Deputy Jeromy Belin testified that he has investigated several assaults resulting in broken facial bones and facial reconstruction. Deputy Belin explained that "[t]he face is constructed of many small bones . . . around your eyes and nose." He stated that "to receive several blows, especially in one concentrated area, is going to tenderize that area, and then you get a better chance of breaking something in that area." Deputy Belin

opined that appellant used his fist in a manner capable of causing serious bodily injury.

The jury found appellant guilty on both counts. This appeal followed.

## II. Sufficiency of the Evidence

By his first two issues, appellant argues the evidence is insufficient to support his convictions for aggravated assault and assault family violence.

### A. Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (emphasis in *Jackson*); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899; *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). We resolve any inconsistencies in the testimony in favor of the verdict. *Bynum v. State*, 767 S.W.2d 769, 776 (Tex. Crim. App. 1989) (en banc).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

### B. Assault Family Violence

By his first issue, appellant argues "[t]he evidence is insufficient to support the conviction for Assault Family Violence ... as [appellant] and the alleged victim were not members of a household." Appellant contends that "the Texas Legislature did not intend for the term 'household' to encompass inmates in the county jail placed in the same cell, and a finding of such would lead to absurd consequences."

#### 1. Applicable Law

Section 22.01(b)(2) enhances the offense of assault causing bodily injury from a class A misdemeanor to a third-degree felony. *Agbogwe v. State*, 414 S.W.3d 820, 840 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing Tex. Penal Code Ann. § 22.01(b)(2)(A)). As relevant here, the offense is a third-degree felony if it is committed against "a person whose relationship to or association with the defendant is described by Section ... 71.005 [defining household], Family Code" and if "it is shown on the trial of the offense that the defendant has been previously convicted of an offense under this chapter ... against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code." Tex. Penal Code Ann. § 22.01(b)(2).

Under a hypothetically correct jury charge, the State was required to prove (1) appellant (2) intentionally, knowingly, or recklessly (3) caused bodily injury to Pullin (4) who is a member of appellant's household, and (5) had previously been convicted

of an assault involving family violence. *See id.*; *see also McZeal v. State*, No. 13-12-00060-CR, 2013 WL 1688856, at *2 (Tex. App.—Corpus Christi Apr. 18, 2013, no pet.) (mem. op., not designated for publication).

### 2. Analysis

Appellant contends that cellmates are not members of the same household as defined by section 71.005 of the family code. *See* Tex. Fam. Code Ann. § 71.005 (West, Westlaw through 2015 R.S.). As we can find no Texas cases discussing the application of section 71.005 in this context, the issue appears to be one of first impression. In resolving this question, we must construe the pertinent statutory language. When we interpret a statute, "we seek to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation." *Reynolds v. State*, 423 S.W.3d 377, 382 (Tex. Crim. App. 2014) (quoting *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). We begin our analysis by attempting to discern the fair, objective meaning of the text at the time of the statute's enactment. *Id.* "Where [statutory language] is clear and unambiguous, we will give effect to its plain meaning[.]" *Id.* This is so because we assume that the plain language best reflects the intent of the legislature. *Boykin*, 818 S.W.2d at 785. Only if the plain language of a statute would lead to absurd results, or if the language is ambiguous, may we consider extratextual factors such as executive or administrative interpretations of the statute or legislative history. *Id.* at 785–86. Ambiguity exists when a statute may be understood by reasonably well-informed persons in two or more different senses; conversely, a statute is unambiguous when it permits only one reasonable understanding. *Mahaffey v. State*, 364 S.W.3d 908, 913 (Tex. Crim. App. 2012).

Section 71.005 defines a "household" as "a unit composed of persons living together in the same dwelling, without regard to whether they are related to each other." Tex. Fam. Code Ann. § 71.005. The terms "dwelling," "living together" or "living" are not defined by the family code or the penal code, which incorporates section 71.005 by reference, so we must give these terms their ordinary and common meaning. In determining the ordinary and common meaning of an undefined word in a statute, we may consider dictionary definitions. *See Ex parte Rieck*, 144 S.W.3d 510, 512 (Tex. Crim. App. 2004); *see also Lane v. State*, 933 S.W.2d 504, 515 n. 12 (Tex. Crim. App. 1996) (reiterating "that use of dictionary definitions of words contained in the statutory language is part of the 'plain meaning' analysis that an appellate court initially conducts … to determine whether or not the statute in question is ambiguous"). A "dwelling" is defined as "a shelter (as a house) in which people live." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/dwelling (last visited April 19, 2017). The terms "live" and its present participle, "living," are most commonly understood to mean, "to occupy a home" or "to dwell." *Id.*, http://www.merriam-webster.com/dictionary/live (last visited April 19, 2017).

In contrast, the penal code defines a "correctional facility" as "a place designated by law for the confinement of a person arrested for, charged with, or convicted of a criminal offense." Tex. Penal Code Ann. § 1.07(14) (West, Westlaw through 2015 R.S.). The term includes "a municipal or county jail." *Id.* § 1.07(14)(A). A jail is not intended or designed for occupancy as a dwelling or home. Rather, the primary purpose of a correctional facility is to insure the public safety through "the deterrent influence of the penalties[,] … the rehabilitation of those convicted" and the prevention of the "likely recurrence of

criminal behavior[.]" *Id.* § 1.02(1) (West, Westlaw through 2015 R.S.). As observed by the United States Supreme Court, "[p]risons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct." *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Inmates in a correctional facility are not free to come and go as they please and are subjected to a regimented daily schedule for meals and recreation. We further note that a correctional facility has the capability of ensuring inmate safety through the presence of corrections officers and the authority to segregate violent inmates. There is a clear distinction between a dwelling, where related and non-related individuals may choose to reside,[3] and a jail, where an individual is confined involuntarily for penal purposes.

 For the aforementioned reasons, we conclude that the plain meaning of "household" does not encompass cellmates in a correctional facility such as a jail.[4] *See Reynolds*, 423 S.W.3d at 382. Therefore, the evidence is legally insufficient to establish that appellant and the victim of the assault were members of the same household. *See Johnson*, 364 S.W.3d at 293–94. We sustain appellant's first issue.

3. While certain family members such as children do not necessarily choose where to reside, we note that such individuals are protected from family violence under the definition of "family" found in section 71.003 of the family code. *See* TEX. FAM. CODE ANN. § 71.003 (West, Westlaw through 2015 R.S.).

4. We have found little authority from other jurisdictions addressing whether inmates are members of a household. A federal district court has held that a jail is not a dwelling within the meaning of the Fair Housing Act. *See Garcia v. Condarco*, 114 F.Supp.2d 1158, 1161 (D.N.M. 2000). In *Livingood v. Negrete*, the Iowa Supreme Court held that prison

## C. Aggravated Assault

By his second issue, appellant argues "[t]he evidence is insufficient to support the conviction for [a]ggravated [a]ssault ... as [appellant's] hands were not deadly weapons." Specifically, appellant maintains Pullin had minimal injuries as a result of the assault, "illustrating that the manner that [appellant] used his hands ... was incapable of causing death or serious bodily injury."

### 1. Applicable Law

"A person commits [aggravated assault] if the person commits assault as defined in § 22.01 and the person: (1) causes serious bodily injury to another ...; *or* (2) uses or exhibits a deadly weapon during the commission of the assault." TEX. PENAL CODE ANN. § 22.02(a) (emphasis added). Here, the State did not seek to prove appellant caused serious bodily injury. Therefore, under a hypothetically correct jury charge in this case, the State was required to prove (1) appellant (2) intentionally, knowingly, or recklessly (3) caused bodily injury to another, and (4) used or exhibited a deadly weapon during the commission of the assault. *See id.* §§ 22.01, 22.02(a)(2). A deadly weapon may be anything that in the manner of its use is capable of causing death or serious bodily injury. *See id.*

cellmates were not "persons cohabiting" under Iowa's Domestic Abuse Act. 547 N.W.2d 196, 197–98 (Iowa 1996). In its supplemental brief filed after oral argument, the State argues that "unlike Iowa's restrictive and narrow approach, the Texas Legislature has established a low legal threshold for establishing facts to turn a simple assault into an assault family violence and qualify the victim as a member of the defendant's household." (internal citations omitted). We recognize that the Iowa statute utilizes different language in defining household members. Therefore, we do not rely on the reasoning in *Livingood* in construing the Texas statute.

§ 1.07(a)(17) (West, Westlaw through 2015 R.S.). Serious bodily injury is bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss of any bodily member or organ. *Id.* § 1.07(a)(46).

### 2. Analysis

■■■ The indictment alleged that appellant's hands constituted a deadly weapon. "A hand is not a deadly weapon per se, but it may be a deadly weapon within the meaning of § 1.07(a)(17) "depending upon the evidence shown." *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004) (quoting *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983)). When the State alleges the use of a deadly weapon, it must prove beyond a reasonable doubt that the weapon alleged was used in a manner capable of causing death or serious bodily injury. *See Hill v. State*, 913 S.W.2d 581, 584 (Tex. Crim. App. 1996); *Hester v. State*, 909 S.W.2d 174, 179 (Tex. App.—Dallas 1995 no pet.). The evidence must establish that the object had more than a hypothetical capability of causing death or serious bodily injury. *Johnston v. State*,

115 S.W.3d 761, 764 (Tex. App.—Austin 2003), *aff'd*, 145 S.W.3d 215 (Tex. Crim. App. 2004); *see also Rushing v. State*, No. 12-14-00112-CR, 2015 WL 1325756, at *5 (Tex. App.—Tyler Mar. 25, 2015, pet. ref'd). The State need not show that an object actually caused serious bodily injury. *See McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). But the injuries, if any, inflicted on a complainant are factors to be considered in determining whether a hand was used as a deadly weapon.[5] *Lane*, 151 S.W.3d at 191. In concluding that hands were used as a deadly weapon, Texas courts have cited injuries such as unconsciousness, vision impairment, brain injury, internal injury, and those suffered from strangulation. *See, e.g., Lane*, 151 S.W.3d at 191–92 (injuries included a concussion, unconsciousness, bruising, nausea, vomiting, and dizziness); *Hopper v. State*, 483 S.W.3d 235, 239–40 (Tex. App.—Fort Worth 2016, pet. ref'd) (defendant strangled multiple persons causing fading vision and the loss of feeling in the arms and resulting in injuries consistent with strangulation, including

---

**5.** We generally observe that under the available analytical framework for reviewing a deadly weapon finding, the line between a misdemeanor assault and an aggravated assault is difficult to define when a defendant is alleged to have used only his hands. We believe Justice Dauphinot's dissent in *Hopper v. State* is illustrative of these concerns:

> A woman may dunk her husband's head under water while they are swimming, either playfully or in anger. But the fact that he could drown if held under the water for an extended period of time does not mean that the woman used the water as a deadly weapon. It means she dunked her husband. The fact that it is possible to beat a person to death or to kick a person to death does not mean that a person who delivers a single punch or kick, or more than one, is necessarily using his hand or foot as a deadly weapon.

483 S.W.3d 235, 245 (Tex. App.—Fort Worth 2016, pet. ref'd) (Dauphinot, J., dissenting). In

*United States v. Rocha*, the United States Court of Appeals for the Ninth Circuit held that hands cannot constitute a "dangerous weapon" under a federal statute. 598 F.3d 1144, 1157 (9th Cir. 2010). The court explained as follows:

> We find it difficult to see how someone could be accused of assault without using a body part in some way. If the assault is made with the intent to do bodily harm, it appears that every assault with intent to do bodily harm would satisfy § 113(a)(3) without any independent showing of the use of a "dangerous weapon." This reading would blur the line Congress drew between simple assault and various forms of aggravated assault subject to a more severe penalty.

*Id.* As noted in *Rocha*, Texas is in the minority of states allowing body parts to be considered dangerous or deadly weapons. *See id.* at 1155–56 (collecting cases).

petechial hemorrhaging and bruising around the neck); *Baltazar v. State*, 331 S.W.3d 6, 8–9 (Tex. App.—Amarillo 2010, pet. ref'd) (injuries included unconsciousness, bloody nose, bruises, abrasions, numbness, headaches, double vision, and blurriness in left eye); *Jefferson v. State*, 974 S.W.2d 887, 891 (Tex. App—Austin 1998, no pet.) (explaining that the complainant was stunned by the first blow, could not see after the second blow, and later suffered blurred vision, a scar on eyebrow, and jaw discomfort); *Brooks v. State*, 900 S.W.2d 468, 472–73 (Tex. App.—Texarkana 1995, no pet.) (injuries included traumatic contusion of the brain); *see also Goode v. State*, No. 03-10-00254-CR, 2011 WL 477038, at *5 (Tex. App.—Austin Feb. 9, 2011, no pet.) (mem. op., not designated for publication) (describing injuries consistent with strangulation).

▉ Here, the record reflects that Pullin suffered bruising to his face, a laceration to his nose, and numbness on his head. Pullin was discharged less than an hour after arriving at the emergency room, where he was assessed as being alert and oriented to person, place, and time. Pullin's laceration was treated with stitches, a topical antibiotic, and an adhesive bandage. Upon discharge, Pullin was instructed to take Tylenol every four hours as needed for pain and reapply the topical antibiotic. Other than having his stitches removed, there is no evidence Pullin sought additional medical treatment for his injuries. We conclude that Pullin's injuries do not demonstrate that appellant used his hands in a manner that was capable of causing death or serious bodily injury.

▉ Rather, the injuries and the State's remaining evidence establish only the hypothetical capability of hands to cause death or serious bodily injury. *See Johnston*, 115 S.W.3d at 764. Deputy Belin opined that when a person "receive[s] several blows, especially in one concentrated area, [it is] going to tenderize that area, and then you get a better chance of breaking something in that area." However, "[a] deadly weapon finding must be supported by evidence relating directly to the circumstances of the criminal episode." *Id.* In other words, we must evaluate the capability of an object to cause death or serious bodily injury "in light of the facts that actually existed when the [assault] was committed." *Id.* Appellant hit Pullin once in the back of the head, while he was standing at the window attempting to get an officer's attention. This caused Pullin's nose to strike the ledge of the window.[6] Witnesses then observed appellant delivering "a few" punches to the face and upper body while Pullin was in a defensive position, but there was no evidence that appellant delivered repeated, targeted blows in a manner that would cause the type of injuries contemplated by Deputy Belin's testimony. *Cf. Brooks*, 900 S.W.2d at 472–73 (concluding that the evidence was legally sufficient to establish that the defendant's hands were deadly weapons where the defendant knocked a person unconscious "then sat astride his chest and pounded his face and head with both fists").

---

**6.** There was no evidence or testimony that appellant used his hands in such a way as to cause an unimpeded fall to a hard surface. *Cf. Kennedy v. State*, 402 S.W.3d 796, 802 (Tex. App.—Fort Worth 2013, pet. struck) (concluding that there was sufficient evidence that defendant used his hands as a deadly weapon where he shoved the elderly person causing him to hit his head on the concrete floor fracturing his skull); *Sharpnack v. State*, No. 03-13-00689-CR, 2015 WL 4397128, at *3 (Tex. App.—Austin July 9, 2015, pet. ref'd) (concluding that a punch to the face that causes unconsciousness and an unbroken fall to the sidewalk can result in death or serious bodily injury).

Reversal on evidentiary sufficiency grounds is restricted to "the rare occurrence when a factfinder does not act rationally." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *see Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"). In other words, the appellate scales are weighted in favor of upholding a trial court's judgment of conviction. *Winfrey v. State*, 323 S.W.3d 875, 879 (Tex. Crim. App. 2010). Nevertheless, we conclude that a rational trier of fact could not have found beyond a reasonable doubt that appellant used his hands in a manner capable of causing death or serious bodily injury. *See Johnson*, 364 S.W.3d at 293–94. Rather, the evidence established only the hypothetical capability of hands to be used in such a manner. *See Johnston*, 115 S.W.3d at 764; *Lane*, 151 S.W.3d at 191. Therefore, there is legally insufficient evidence that appellant committed the offense of aggravated assault with a deadly weapon. We sustain appellant's second issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By his third issue, appellant argues he was "denied the effective assistance of counsel ... as a result of [his] trial counsel's multiple acts of deficient performance." Appellant maintains his trial counsel was ineffective for failing to (1) suppress appellant's written statement, (2) object to expert testimony, (3) object to the admission of two prior convictions, (4) introduce evidence to the jury that the jail's "control room alerts were recorded and deleted," (5) request a mutual combat jury instruction, and (6) impeach Pullin with his prior assault convictions.

### A. Standard of Review and Applicable Law

To prevail on an ineffective assistance claim, appellant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez*, 343 S.W.3d at 142. To satisfy the first prong, appellant must prove by a preponderance of the evidence that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id.* To prove prejudice, appellant must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different. *Id.*

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if appellant rebuts the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Lopez*, 343 S.W.3d at 142. "In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Lopez*, 343 S.W.3d at 142; *see Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("Any allegation of ineffectiveness must be firmly rooted in the record[.]"). "It is not sufficient that appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). When direct evidence is unavailable, we will assume counsel had a

strategy "if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143. "In making an assessment of effective assistance of counsel, an appellate court must review the totality of the representation and the circumstances of each case without the benefit of hindsight." *Id.*

Although an appellant may claim ineffective assistance of counsel for the first time on direct appeal, the record in such a case often will not be sufficient to overcome the presumption that counsel's conduct was reasonable and professional. *Cannon v. State*, 252 S.W.3d 342, 349 (Tex. Crim. App. 2008); *Washington v. State*, 417 S.W.3d 713, 724 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Where, as here, there is no proper evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult to show trial counsel's performance was deficient. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Under this procedural posture, we will not find deficient performance unless counsel's conduct is so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Washington*, 417 S.W.3d at 724.

## B. Analysis

### 1. Suppression of Written Statements

Appellant first argues his trial counsel was ineffective "to not suppress [his] written statement[.]" Specifically, appellant maintains the statement was inadmissible because it did not contain "the required [a]rticle 38.22 warnings." *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West, Westlaw through 2015 R.S.).

An attorney's failure to file a motion to suppress evidence does not demonstrate a deficient performance by counsel

per se. *Cotton v. State*, 480 S.W.3d 754, 757 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *see Castellano v. State*, 49 S.W.3d 566, 576–77 (Tex. App.—Corpus Christi 2001, pet. ref'd) (holding that the failure to file motion to suppress did not constitute ineffective assistance of counsel). An appellant must prove a motion to suppress would have been granted in order to satisfy *Strickland*. *Cotton*, 480 S.W.3d at 757; *see Roberson v. State*, 852 S.W.2d 508, 510–12 (Tex. Crim. App. 1993) (explaining that unless there is a showing that a pretrial motion had merit and that a ruling on the motion would have changed the outcome of the case, counsel will not be ineffective for failing to assert the motion).

Article 38.22 provides that a written statement by an accused made as a result of a custodial interrogation is not admissible unless "on the face of the statement" it shows the accused received, among other things, notice of the right to remain silent and right to counsel. Tex. Code Crim. Proc. Ann. art. 38.22 § 2. However, the protections under article 38.22 are limited to interrogations that are custodial in nature. *See Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). Incarceration does not always equate to custody when an inmate is questioned about an offense unrelated to the inmate's incarceration. *Id.* at 532. Rather, the question of custody should be evaluated under the "traditional 'custody' analytical framework." *Id.* The Texas Court of Criminal Appeals has adopted the following factors for determining whether an inmate is in custody: (1) the language used to summon the inmate; (2) the physical surroundings of the interrogation; (3) the extent to which the inmate is confronted with evidence of his or her guilt; (4) the additional pressure exerted to detain the inmate or the change in the surroundings of the inmate which results in an added imposition

of the inmates freedom of movement; and (5) the inmate's freedom to leave the scene and the purpose, place, and length of the questioning. *Id.* The court in *Herrera* concluded that the appellant failed to meet his burden of establishing he was in custody because "[b]eyond the purpose of the questioning—to gather information about the fight—the record is devoid of any facts relating to the factors relevant to determining 'custody[.]'" *Id.*

Here, the record demonstrates that Deputy Travis Vega went to appellant's cell and "asked [appellant] what happened." Deputy Vega then requested a written statement and "handed [appellant] the piece of paper [and] told him to put on the statement whatever he felt he needed to put on the statement." Deputy Vega later typed appellant's statement and provided him an opportunity to review it before signing. The statement reads in part:

> I, [appellant], am not under arrest for, nor am I being detained for any criminal offense concerning the event I am about to make known to [Deputy Vega], without being accused of or questioned about any criminal offenses regarding the facts I am about to state. I volunteer the following information of my own free will, for whatever purpose it may serve.

■ As noted above, an allegation of trial counsel's deficiency must be affirmatively demonstrated in the trial record. *Lopez*, 343 S.W.3d at 142. "[T]he record on direct appeal is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance and that the better course is to pursue the claim in habeas proceedings." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). We are unable to conclude from the limited record before us that appellant was in custody when he provided a written statement. Accordingly, appellant is unable to demonstrate that a

motion to suppress his written statement would have been granted by the trial court. *See Cotton*, 480 S.W.3d at 757.

### 2. Expert Testimony

■ Next, appellant argues his trial counsel was ineffective for "fail[ing] to object to expert testimony ... regarding what constitutes deadly weapons when no expert notice was given." *See* Tex. Code Crim. Proc. Ann. art 39.14 (West, Westlaw through 2015 R.S.). The clerk's record reflects that appellant's counsel was in fact provided with a designation of experts identifying the officers who testified at trial concerning the deadly weapon issue. Therefore, appellant's trial counsel was not ineffective for failing to object on this basis.

### 3. Prior Convictions

Next, appellant argues his trial counsel was ineffective for failing to object to the admission of appellant's two prior assault convictions involving family violence. Appellant maintains that "while the State must prove one prior assault family violence conviction; it is prejudicial for the State to prove two prior assault family violence convictions."

■ To establish ineffective assistance of counsel based on a failure to object to evidence, the appellant must demonstrate the trial court would have committed harmful error in overruling the objection. *DeLeon v. State*, 322 S.W.3d 375, 381 (Tex. App.—Houston [14th Dist.] 2010). As noted above, to establish the offense of assault family violence, the State was required to prove that appellant was "previously convicted of an [assault] ... against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code." Tex. Penal Code Ann. § 22.01(b)(2). The State must necessarily prove the existence of a prior conviction

where, as here, it is an element of the charged offense. *Robles v. State*, 85 S.W.3d 211, 213–14 (Tex. Crim. App. 2002). However, where a defendant stipulates to the prior convictions, reading or introducing the stipulation to the jury is sufficient to meet the State's burden of proof, making extraneous evidence of the prior convictions inadmissible under Texas Rule of Evidence 403. *See Robles v. State*, 85 S.W.3d 211, 213–14 (Tex. Crim. App. 2002); *Tamez v. State*, 11 S.W.3d 198, 202 (Tex. Crim. App. 2000). But absent a stipulation by the accused as to the prior conviction, the State is not prohibited from proving the prior conviction by other means. *See Tamez*, 11 S.W.3d at 202.

■■■ Here, appellant refused on the record to stipulate to any of his prior convictions. Accordingly, appellant has failed to establish that an objection to the admission extraneous evidence concerning the convictions would have been granted. *See DeLeon*, 322 S.W.3d at 381.

#### 4. Failure to Introduce Evidence

■■■ Appellant also argues his trial counsel was ineffective for "fail[ing] to admit evidence to the jury that the control room alerts were recorded but not available."

Prior to trial, appellant's counsel informed the trial court that the State failed to turn over evidence. According to the representations of counsel, the Gonzalez County jail was equipped with an intercom system that recorded the calls made from cells to the control room. Appellant's counsel argued an intercom call was placed by Pullin during the assault and possibly contained exculpatory evidence. The State responded that, after a period of time, the jail's intercom system automatically records over older calls, and the recordings were no longer available. Appellant's trial

counsel moved for a mistrial on this basis, but the trial court denied the motion.

However, the record reflects that the jury did hear evidence concerning the missing recordings. At trial, appellant's counsel questioned jail employee Margaret Sanchez regarding the recordings. Through his examination of Sanchez, appellant's counsel established that the intercom communications were recorded, but they were not made available to appellant's counsel. Under these facts, we cannot conclude that counsel's failure to further develop this issue was so outrageous that no competent attorney would have engaged in it. *See Goodspeed*, 187 S.W.3d at 392; *Washington*, 417 S.W.3d at 724.

#### 5. Failure to Request "Mutual Combat" Instruction

■■■ Next, appellant argues his trial counsel was ineffective for "fail[ing] to request a mutual combat instruction[.]" To demonstrate deficient performance based on the failure to request a jury instruction, an appellant must show he was entitled to the instruction. *Washington*, 417 S.W.3d at 726 (citing *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999)). When an appellant has nothing to lose by requesting a defensive instruction and it would have been error for the trial court to refuse the instruction, we may find deficient performance even without counsel's explanation for failing to request the instruction. *Id.* (citing *Vasquez v. State*, 830 S.W.2d 948, 951 (Tex. Crim. App. 1992) (defense of necessity); *Ex parte Zepeda*, 819 S.W.2d 874, 877 (Tex. Crim. App. 1991) (accomplice witness)).

■■■ The victim's effective consent or the actor's reasonable belief the victim consented to the actor's conduct is a defense to assault if the conduct did not threaten or inflict serious bodily injury. TEX. PENAL CODE ANN. § 22.06(a)(1) (West,

Westlaw through 2015 R.S.). "When evidence at trial raises the defense of consent, 'the court shall charge [the jury] that a reasonable doubt on the issue requires that the defendant be acquitted.'" *Allen v. State*, 253 S.W.3d 260, 261 (Tex. Crim. App. 2008) (quoting TEX. PENAL CODE ANN. § 2.03(d) (West, Westlaw through 2015 R.S.)). But when a party claims the defense of consent or "mutual combat," there must be evidence of an antecedent agreement to fight. *See Lujan v. State*, 430 S.W.2d 513, 514 (Tex. Crim. App. 1968); *see also Miller v. State*, 312 S.W.3d 209, 212 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (concluding evidence existed that a teenager provoked his father into a fight; therefore, the trial court erred by refusing the instruction). The evidence supporting a consent defense may be presented by the State or the defense. *Miller*, 312 S.W.3d at 212. If the evidence viewed in the light most favorable to appellant supports the defense, then an instruction is required. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

There is no evidence Pullin agreed to engage in a fight with appellant. To the contrary, the evidence establishes that appellant repeatedly expressed his intent to "whoop [Pullin's] ass" if he and Pullin were not separated. Further, appellant does not dispute that he hit Pullin in the back of the head while appellant was seeking the assistance of jail staff. On this record, we cannot say the trial court would have abused its discretion in refusing a "mutual combat" instruction. *See Washington*, 417 S.W.3d at 726; *see also Skipper v. State*, No. 14-00-00484-CR, 2001 WL 893291, at *2 (Tex. App.—Houston [14th Dist.] Aug. 9, 2001, pet. ref'd) (not designated for publication) (holding that offensive or provocative conduct by the complainant, including yelling, pushing, and hitting defendant with food, did not equate to consent to an assault). Therefore, appellant's counsel was

not ineffective for failing to request the instruction.

### 6. Failure to Impeach Complainant

▇▇ Finally, appellant argues his trial counsel was ineffective for "not impeach[ing] ... [Pullin] with his prior [misdemeanor] assault convictions [involving family violence]." Prior to jury selection, the State informed the trial court that Pullin had three prior felony theft convictions, and three prior misdemeanor convictions, including two misdemeanor assault convictions involving family violence. Appellant's trial counsel agreed with the State's assertion that he could only impeach Pullin with his prior felony convictions.

▇▇ Texas Rule of Evidence 609 provides that evidence of a witness's prior conviction shall be admitted as impeachment evidence if the crime was a felony or a misdemeanor involving moral turpitude, and the court determines that the probative value of admitting the prior conviction outweighs its prejudicial effect. TEX. R. EVID. 609(a). Generally, a misdemeanor assault is not a crime of moral turpitude. *See, e.g., Garza v. State*, 143 Tex.Crim. 624, 160 S.W.2d 926, 927 (Tex. Crim. App. 1942); *Gray v. State*, 86 S.W. 764, 765 (Tex. Crim. App. 1905); *Patterson v. State*, 783 S.W.2d 268, 271 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd). Texas courts have recognized an exception to this rule when the assault is committed by a male against a female or the victim is a child. *See Hardeman v. State*, 868 S.W.2d 404, 407 (Tex. App.—Austin 1993, pet. dism'd) (discussing the progression of case law regarding assaults against females and holding that a conviction for misdemeanor assault "by a man against a woman is a crime involving moral turpitude and therefore is admissible as impeaching evidence under [R]ule 609"); *Campos v. State*, 458 S.W.3d 120,

149 (Tex. App.—Houston [1st Dist.] 2015) (determining that a conviction for misdemeanor assault on a minor family member constitutes a crime of moral turpitude and may be used for impeachment purposes if other requirements are met), *vacated on other grounds*, 466 S.W.3d 181, 182 (Tex. Crim. App. 2015); *Tenery v. State*, 680 S.W.2d 629, 639 (Tex. App.—Corpus Christi 1984, pet. ref'd) (concluding that the offense of an assault on a female is a crime involving moral turpitude); *see also Davis v. State*, No. 10-16-00011-CR, 2016 WL 7321289, at *1 (Tex. App.—Waco Dec. 14, 2016, no pet.) (observing that no Texas appellate court has held that assault with bodily injury based on family violence is automatically admissible as a crime of moral turpitude). There is no evidence in the record establishing the gender or age of the complainant(s) of Pullin's prior assaults. Accordingly, we are unable to conclude that Pullin's prior convictions would have been admissible as a crime of moral turpitude. As a result, appellant's allegation of ineffectiveness is not affirmatively demonstrated by the record. *See Thompson*, 9 S.W.3d at 813.

### 7. Summary

Having concluded that the alleged deficiencies of appellant's trial counsel are not affirmatively demonstrated in the trial record, we overrule appellant's third issue. *See Lopez*, 343 S.W.3d at 142.

### IV. DISPOSITION

 While not raised by the parties, we must address the proper disposition resulting from reversal of the convictions. If an appellate court concludes that the evidence was legally insufficient to support a conviction, we are required to determine whether the judgment should be reformed to reflect a conviction for a lesser-included offense. *See Canida v. State*, 434 S.W.3d 163, 166 (Tex. Crim.

App. 2014). Reformation of the judgment is appropriate if we are able to answer "yes" to the following questions:

1) in the course of convicting the appellant of the greater offense, must the jury have necessarily found every element necessary to convict the appellant for the lesser-included offense; and 2) conducting an evidentiary sufficiency analysis as though the appellant had been convicted of the lesser-included offense at trial, is there sufficient evidence to support a conviction for that offense?

*Thornton*, 425 S.W.3d at 289. "[I]f the answers to both [questions] are yes, the court is authorized—indeed required—to avoid the 'unjust' result of an outright acquittal by reforming the judgment to reflect a conviction for the lesser-included offense." *Id.* at 300 (internal footnote omitted). An outright acquittal under these circumstances would be unjust because the result would involve usurping the fact finder's determination of guilt. *Id.* at 298. A court of appeals should limit the use of judgment reformation to those circumstances when the commission of a lesser offense can be established from the facts that the jury actually found. *Id.*

 To convict appellant of the lesser-included offense of assault causing bodily injury, the State would have been required to prove beyond a reasonable doubt that (1) appellant (2) intentionally, knowingly or recklessly (3) caused bodily injury to Pullin. *See* TEX. PENAL CODE ANN. § 22.01 (West, Westlaw through 2015 R.S.). For both counts, the jury, in the course of finding appellant guilty of the greater offense, must have necessarily found every element necessary to convict appellant of assault causing bodily injury. Further, having reviewed the evidence presented at trial, we conclude there is legally sufficient evidence to support a conviction for assault causing bodily injury. *See Johnson*, 364

S.W.3d at 293–94. Therefore, the judgment should be reformed to reflect a single conviction for assault causing bodily injury.[7]

### V. Conclusion

We reverse appellant's convictions for aggravated assault and assault family violence. We remand the case to the trial court to reform the judgment to reflect a single conviction for assault causing bodily injury, a class A misdemeanor, and to conduct a new punishment hearing. *See Thornton*, 425 S.W.3d at 307.

---

**7.** Reforming the judgment to reflect two convictions for assault causing bodily injury would violate appellant's double jeopardy protection against multiple punishments for the same offense. *See Aekins v. State*, 447 S.W.3d 270, 274 (Tex. Crim. App. 2014).